IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| SUSAN FLINT and GEOFFREY FLINT,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF KAUAI, ET AL.,<br><br>Defendants. | CIV. NO. 19-00521 JMS-WRP<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

## I. INTRODUCTION

This case arises out of devastating flooding that occurred on the island of Kauai in 2018.  The flooding caused widespread destruction and triggered numerous landslides that damaged the only road into the north shore's Lumahai-Wainiha-Haena area, wholly isolating communities there.  In response, the County of Kauai ("County") enacted an Emergency Rule temporarily limiting access to the area to residents and emergency workers until the road could be repaired and normal travel could safely resume.  The Rule remained in effect for slightly less than one year.

Plaintiffs Susan and Geoffrey Flint ("Plaintiffs") owned a property in the Lumahai-Wainiha-Haena area, which they used as a transient vacation rental ("TVR"). They were unable to rent the property to vacationers while the rule was in effect. Plaintiffs allege that this temporary prohibition on vacation rentals violated the United States and Hawaii Constitutions by (1) effecting a taking of their property without just compensation; (2) depriving them of their right to substantive and procedural due process; and (3) denying them equal protection of the laws. Plaintiffs also allege that the Rule (4) violated the Contract Clause of the United States Constitution; (5) violated Hawaii Revised Statues ("HRS") Chapter 127A-21's prohibition on requisition of property without just compensation; and (6) that the County was equitably estopped from interfering with their vested right to use their property as a TVR. ECF No. 1 at PageID ## 10-18.

The County now moves for summary judgment as to each claim and Plaintiffs moves for summary judgment as to the takings, due process, and Contract Clause claims. ECF Nos. 27 & 29. For the reasons set forth below, the County's Motion is GRANTED and Plaintiff's Motion is DENIED.

## II.  BACKGROUND

From April 13 to 16, 2018, the island of Kauai was subject to heavy rains and devastating flooding. ECF No. 28-15 at PageID # 200. Across the island, flood waters entered buildings, washed homes off their foundations,

2

triggered landslides and sinkholes, and caused widespread electrical and water system disruptions.  *Id.* at PageID ## 201-02.  Most severely impacted was the Lumahai-Wainiha-Haena area on Kauai's north shore (the "distressed area").  *Id.* at PageID # 202; ECF No. 39 at PageID # 474.  The flooding triggered more than a dozen landslides along Kuhio Highway—the only road into the distressed area— rendering the highway impassible and completely isolating the communities living there.  ECF No. 28-15 at PageID # 202.  Because there are no first-responder services located in the distressed area, these isolated communities were left without medical supplies or assistance beyond what was available in their own homes and in lifeguard towers.  *Id.* at PageID # 203.

On April 14, 2018, the mayor of Kauai proclaimed a state of emergency and assumed emergency powers pursuant to HRS Chapter 127 in order to "provide relief for disaster damages, losses, and suffering, and to protect the health, safety, and welfare of the people."  ECF No. 28-9 at PageID # 184.  More than 400 tourists were airlifted out of the distressed area by the U.S. Army and the Hawaii National Guard and more than 43,000 pounds of food, water, and clothing were delivered by the U.S. Army to trapped residents.  ECF No. 28-15 at PageID # 203.  The County considered completely evacuating the distressed area but determined that relocating all residents from their homes and housing them for a prolonged period would not be economically or logistically feasible.  ECF No. 28-

3

2 at PageID # 167.  Thus, the County moved forward with disaster relief with the "primary objective" of "[k]eeping residents in [their] homes while balancing access for employment."  *Id.*

Pursuant to the emergency proclamation, the mayor issued "Mayor's Emergency Rule # 1" ("Emergency Rule"), effective May 4, 2018 through March 4, 2019.  ECF 28-10 at PageID # 190.  The Rule imposed a "prohibition on the operation of Transient Vacation Rentals (TVRs) in the area" and limited access to the distressed area to "[r]esidents (no visitors)" and emergency responders.  *Id.* The purpose of the Emergency Rule was to ensure the safe and efficient repair of Kuhio Highway.  ECF No. 28-17 at PageID # 209; ECF No. 28-2 at PageID # 168. Landslides had caused structural damage to the road that required more than "twenty-two major [repair] tasks[,] including the stabilization of the slope at Wainiha Bay and the rebuilding of sections where the embankment below the road was washed away in the disaster" before it would be safe for normal traffic to resume.  ECF No. 28-16 at PageID # 206.  The prohibition on vacationers and other visitors entering the distressed area was intended to reduce the number of travelers on Kuhio Highway while repairs were ongoing, thereby protecting construction workers and residents who had no choice but to use the unstable road, as well as to reduce wear and tear on the road while critical repairs were ongoing. *See* ECF No. 28-17 at PageID # 209; ECF No. 28-2 at PageID # 168.  Because

Kuhio Highway is the only road into the distressed area and emergency response resources in the area were virtually non-existent, the Rule also aimed to "maintain a low number of individuals at risk in the affected area that may have required emergency assistance."  ECF No. 28-2 at PageID # 168.

On July 11, 2018, the mayor announced his intention to extend the Emergency Rule "until the roadwork repairs on Kuhio Highway, from Waikoko to Wainiha, are completed and the highway is deemed safe for normal travel."  ECF No. 28-18 at PageID # 211.  The Rule was ultimately extended from its original effective end date of March 4, 2019 until April 29, 2019.  ECF No. 29-1 at PageID # 297; ECF No. 27-1 at PageID # 132.  On that date, the prohibition on TVRs was lifted and visitors with verified reservations to stay at a TVR were allowed entry into the area.  ECF No. 28-11 at PageID # 191.  All told, the prohibition on TVR operations lasted just under a year, from May 4, 2018 to April 29, 2019.

In recognition of the economic hardships facing TVR operators while the Rule was in effect, the County taxed their properties at the residential rate rather than the higher TVR rate for the 2019 tax year.  ECF No. 28-4 at PageID # 174.  In addition, TVR operators were not required to comply with permitting

requirements to maintain their TVR licenses for the year following the expiry of the Emergency Rule.[1]  ECF No. 28-13 at PageID # 197.

Plaintiffs are a married couple living in California.  ECF No. 30-2 at PageID # 324.  On January 17, 2017, they purchased a property in the Lumahai-Wainiha-Haena area for $926,000.  ECF No. 28-4 at PageID # 175; ECF No. 30-3 at PageID # 361.  The property had a valid nonconforming use TVR license and Plaintiffs intended to "rent [the property] as a TVR, use it for personal use when [they] visited Kauai, and as a long-term investment."  ECF No. 30-2 at PageID # 324-25.  In March 2017, Plaintiffs purchased an adjacent parcel of land for $371,000.  ECF No. 28-5 at PageID # 177; ECF No. 27-1 at PageID # 131.  Plaintiffs renewed the TVR license for their property for the year 2018, ECF No. 29-1 at PageID # 294, and rented it out to vacationers until the Emergency Rule

---

[1]  TVRs are regulated on Kauai with the aim of balancing the interests of tourists and residents of the island. ECF No. 30-3, at PageID ## 330-31. In 2008, the County enacted Ordinance No. 864, which restricts TVR operations to areas that are zoned as "Visitor Destination Areas." *Id.* at PageID # 330. But properties that had been operating as legal TVRs outside of Visitor Destination Areas prior to the promulgation of the ordinance were allowed to maintain that status, provided they obtained a "non-conforming use certificate for single family vacation rentals" by March 30, 2009. *Id.* at PageID # 339.

To obtain a certificate, property owners were required to submit evidence to the County Planning Director demonstrating "that [the] dwelling unit was being used as a vacation rental on an ongoing basis prior to the effective date of this ordinance and was in compliance with all State and County land use and planning laws." *Id.* In determining whether to issue a certificate, the Planning Director was to consider whether the applicant was able to provide appropriate tax licenses, deposits for reservations, and evidence of consistent occupancy by vacationers prior to passage of the ordinance. *Id.* If the Planning Director deemed the applicant's evidence of prior use sufficient, he was required to issue a nonconforming use certificate, subject to a number of restrictions. *Id.* Every owner or lessee who holds a nonconforming use certificate is required to apply to renew the certificate each year. *Id.* at PageID # 340.

came into effect.  *See* ECF No. 30-2 at PageID # 327.  Plaintiffs were required to cancel rental reservations as a result of the prohibition on TVR operations and "lost significant rental income."  *Id.*  On February 6, 2019, Plaintiffs sold their TVR property for $920,000—$6,000 less than they had paid for it.  *See* ECF No. 28-4 at PageID # 175.  In the same transaction, Plaintiffs also sold their adjacent property for $500,000—$129,000 more than they had paid for it.  *See* ECF No. 28-5 at PageID # 177.

On September 26, 2019, Plaintiffs brought suit against the County advancing a variety of federal and state constitutional claims, as well as state statutory and common law claims.  *See generally* ECF No. 1.  On October 14, 2020, the County moved for summary judgment on all counts, ECF No. 27.  The same day, Plaintiffs filed a cross-motion for summary judgment as to their takings claim, substantive and procedural due process claims, and Contract Clause claim.  ECF No. 29-1 at PageID ## 292-93.  On December 30, 2020, both parties filed oppositions, ECF Nos. 36 & 39, and on January 6, 2021, both parties filed replies, ECF Nos. 41 & 43.  A hearing was conducted by video teleconference on January 20, 2021, ECF No. 49.

## III.  LEGAL STANDARD

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed.

7

R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323).  "When the moving party has carried its burden under Rule 56[(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law."

*In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248).  When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor.") (citations omitted).

## IV.  <u>DISCUSSION</u>

Plaintiffs assert a variety of federal and state constitutional claims as well as state statutory and common law claims, all arising from the 2018 Emergency Rule.  Specifically, Plaintiffs allege that "[u]nder the pretext of an emergency proclamation" the County's temporary prohibition on TVRs violated the United States and Hawaii Constitutions by (1) taking their property without just compensation; (2) depriving them of procedural and substantive due process; and (3) depriving them of equal protection under the laws.  ECF No. 1 at PageID # 2. Plaintiffs also allege the Emergency Rule (4) violated the Contract Clause of the U.S. Constitution;[2]  (5) violated HRS § 127A-21 by requisitioning their property

---

[2]  Plaintiffs also allege, as a *separate* count, that the County "violated Plaintiffs constitutional and civil rights in violation of [42 U.S.C. § 1983]."  ECF No. 1 at PageID # 15. But violations of the United States Constitution may only be brought against states and municipalities under § 1983.  Accordingly, the court construes each of Plaintiffs' federal claims as § 1983 claims and does not construe the generic § 1983 count as a separate claim.

without just compensation; and (6) that the County was equitably estopped from interfering with their "vested rights in the continued use of the Property as a single family transient vacation rental." *See* ECF No. 1 at PageID ## 10-18. The court considers each claim in turn.

## A. Takings

The Fifth Amendment guarantees that private property shall not be "taken for public use, without just compensation." U.S. Const., amend. 5; *see also* Haw. Const., art. 1, § 20 ("Private property shall not be taken or damaged for public use without just compensation.").[3] As a threshold matter, to advance a takings claim a plaintiff must establish that they possess a constitutionally protected property interest. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1000 (1984). Here, Plaintiffs argue that their "nonconforming TVR use is a vested property right protected by the United States and Hawaii Constitutions." ECF No. 29-1 at PageID # 299. "Generally speaking, state law defines property interests." *Stop the Beach Nourishment, Inc. v. Florida Dept. of Env't Protection*, 560 U.S. 702, 707 (2010). But whether nonconforming TVR use constitutes a property right appears to be an unsettled area of state law. *See Maui Vacation Rental Ass'n, Inc.*

---

[3] Plaintiffs allege a taking without just compensation in violation of both the United States and Hawaii Constitutions. Because "[t]he elements of takings claims under federal and Hawaii law are the same," *Bridge Aina Le'a, LLC v. Land Use Comm'n*, 2018 WL 6705529, at *4 (D. Haw. Dec. 20, 2018), the court analyzes these claims together.

*v. Maui Cnty. Plan. Dep't*, 2020 WL 6829753, *4-6 (D. Haw. Nov. 20, 2020) (declining to rule on this sensitive question of state law under the *Pullman* abstention doctrine) (citing *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941)); *Thinh Tran v. Dep't of Plan. for Cnty. of Maui*, 2020 WL 3146584, at *6-7 (D. Haw. June 12, 2020) (same). Here, and as set forth below, because Plaintiffs' takings claims fail on separate grounds, the court assumes without deciding—and solely for the purposes of this Order—that Plaintiffs' have a constitutionally protected interest in the nonconforming use of their property as a TVR.

Next, the court considers whether the County's temporary prohibition on TVR operations amounted to a taking of Plaintiffs' property. The plain language of the Takings Clause requires compensation when the government physically takes possession of private property. *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Plan. Agency*, 535 U.S. 302, 321 (2002). But although "the Constitution contains no comparable reference to *regulations* that prohibit a property owner from making certain uses of [their] private property," the Supreme Court has developed a separate "regulatory takings" jurisprudence to address such situations. *Id.* at 321-22 (emphasis added). Because Plaintiffs argue that a County Rule effected a taking, the court engages in a regulatory taking analysis.

Underlying regulatory takings jurisprudence is the understanding that the state must be afforded broad latitude to regulate for the public good. *See Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 491 (1987). Nevertheless, "government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster . . . compensable under the Fifth Amendment." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). Outside of two "relatively narrow categories" that are not applicable here,[4] "regulatory takings challenges are governed by the standards set forth in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978)." *Id.* at 538.

When reviewing a regulatory takings claim, *Penn Central* instructs courts to consider: "(1) '[t]he economic impact of the regulation on the claimant,' (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations,' and (3) 'the character of the governmental action.'" *Bridge Aina Le'a, LLC v. Land Use Commission*, 950 F.3d 610, 630 (9th Cir. 2020) (quoting *Penn Central*, 438 U.S. at 124), *petition for cert. filed*, (U.S. July 22,

---

[4] These categories are (1) a permanent physical invasion of the plaintiff's property, *see Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982); and (2) a "total regulatory taking," in which the government action completely deprives the plaintiff of any use of their property. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1993); *see also Tahoe-Sierra Preservation Council*, 531 U.S. at 303 (holding that a temporary taking cannot amount to a total regulatory taking because "[b]oth dimensions of a real property interest—the metes and bounds describing its geographic dimensions and the term of years describing its temporal aspect—must be considered when viewing the interest in its entirety").

2020) (No. 20-54).  In considering these factors, the court's aim is "to determine whether a regulatory action is functionally equivalent to the classic [physical] taking." *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1120 (9th Cir. 2010) (en banc) (internal quotation marks omitted).

Although the first and second *Penn Central* factors are the "primary factors," *Bridge Aina Leʻa*, 950 F.3d at 630 (citing *Lingle*, 544 U.S. at 538-39), the outcome "depends largely upon the particular circumstances" of the case.  *Id.* (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 633 (2001) (O'Connor, J., concurring)); *see also Tahoe-Sierra Preservation Council*, 535 U.S. at 322 (explaining that regulatory takings analysis consists of "essentially ad hoc, factual inquiries, designed to allow careful examination and weighing of all the relevant circumstances" (citation and internal quotation marks omitted)).  Nevertheless, "the contours" of regulatory takings analysis have been established: a regulation "'does not constitute a taking if the regulation does not deny a landowner all economically viable use of the property and if the regulation substantially advances a legitimate government interest.'"  *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 965 (9th Cir. 2003) (quoting *Buckles v. King Cnty.*, 191 F.3d 1127, 1140 (9th Cir. 1999)).

///

///

### 1.    *Economic Impact*

To determine the economic impact of an alleged taking, courts "'compare the value that has been taken from the property with the value that remains in the property.'"  *Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 450 (9th Cir. 2018) (quoting *Keystone Bituminous Coal Ass'n*, 480 U.S. at 497).  "Not every diminution in property value caused by a government regulation rises to the level of an unconstitutional taking."  *Id.* (citing *Penn Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922) ("Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.")).

In keeping with the objective of identifying regulatory actions that are "functionally equivalent" to a classic taking, the Ninth Circuit has held that "diminution in property value because of governmental regulation ranging from 75% to 92.5% does not constitute a taking."  *Colony Cove Props.*, 888 F.3d at 451. And the Federal Circuit has noted that it is "'aware of no case in which a court has found a taking where diminution in value was less than 50 percent.'"  *Id.* (quoting *CCA Assocs. v. United States*, 667 F.3d 1239, 1246 (Fed. Cir. 2011)).  "The severity of the loss can be determined only by comparing the post-deprivation value to the pre-deprivation value."  *Id.*

Plaintiffs purchased the property for $926,000 in 2017. ECF No. 28-4 at PageID # 175. And they allege that they suffered the following economic impacts as a result of the Emergency Rule: (1) they were forced to cancel vacation reservations and refund deposits to renters, resulting in loss of "significant rental income"; and (2) they sold their property on February 6, 2019 (two months before the emergency rule expired) "at a value less than they would have received had TVRs been allowed at the time"—namely, $920,000, or $6,000 less than the purchase price.[5] ECF No. 29-1 at PageID # 298; ECF No. 28-4 at PageID # 175.

Plaintiffs have failed to allege a diminution of value sufficient to rise to the level of a taking. *Colony Cove* is instructive. In that case, the plaintiffs alleged that a municipal regulation deprived them of $5.7 million in rental income over an 8-year period. *Colony Cove*, 888 F.3d at 451. The Ninth Circuit explained that "the mere loss of some income because of regulation does not itself establish a taking. Rather, economic impact is determined by comparing the total value of the affected property before and after the government action." *Id.* But because there was no evidence submitted as to the post-deprivation value of the property, the

---

[5] Plaintiffs also argue that the County taxed their property at "the significantly higher 'transient vacation rental' rates, while depriving [Plaintiffs] of the rental income to pay those taxes." ECF No. 29-1 at PageID # 298. But this argument appears to be unfounded. Indeed, the County has provided documentation that Plaintiffs' property was "taxed at the lower residential rate in tax year 2019, rather than as a vacation rental." ECF No. 27-1 at PageID # 133; ECF No. 28-4 at PageID # 174 (documentation of tax rates on the property for the years 2010 through 2020).

Ninth Circuit compared the purchase price, $23 million, to the lost rental income—assuming without deciding that lost rental income could constitute a diminution of property value.  *Id.*  Because the $5.7 million loss in income amounted to only 24.8% of the $23 million pre-deprivation value of the property, the court concluded that this loss was "far too small to establish a regulatory taking."  *Id.*

Here, Plaintiffs purchased the property for $926,000 and sold it for $920,000.  Thus, the difference in pre-deprivation and post-deprivation value of the property is only $6,000, or less than one percent (.065%) of pre-deprivation value.[6]  In addition, Plaintiffs allege that they lost $85,000 in rental income.  ECF No. 28-22 at PageID # 232.  This figure is disputed by the Defendants' expert, who estimates that Plaintiffs lost a total of $21,684.  *Id.* at PageID # 233.  But even assuming Plaintiffs' figure is correct—and assuming lost rental income may be considered a diminution in property value—this loss is still too small to establish a regulatory taking.  Including the lost rental income, Plaintiffs allege a total loss of $91,000 ($6,000 + $85,000), or just 9.8% of the property's pre-deprivation value of $926,000.  A loss of 9.8% falls far short of even the most liberal standard for establishing a regulatory taking (50% loss).  *See CCA Assocs.*, 667 F.3d at 1246.

---

[6] In fact, Plaintiffs may not have suffered a loss at all.  As the County points out, Plaintiffs also sold their adjacent property as part of the same transaction for $500,000, or $129,000 more than they paid for it.  Thus, Plaintiffs made a net profit of $123,000 on the sale.  ECF Nos. 28-4 at PageID # 175; 28-5 at PageID # 177.  Nevertheless, for the purposes of this order, the court assumes a loss of $6,000.

In short, the economic impact prong does not provide any support for Plaintiff's argument that a regulatory taking occurred.

### 2.   *Investment-backed Expectation*

Next, the court considers the extent to which the Emergency Rule interfered with Plaintiffs' distinct investment-backed expectations.  Plaintiffs argue that the Emergency Rule "eliminated Plaintiffs' investment-backed expectation of the Property as a long-term vacation rental investment."  ECF No. 29-1 at PageID # 308.  Plaintiffs explain that they purchased the property "with the intention of renting it as a vacation rental and it had been successfully and consistently rented as a vacation rental by the previous owner."  *Id.*  Because they held a non-conforming use permit, Plaintiffs explain, "the only expectation was that Plaintiffs would submit the renewal paperwork every year, but could otherwise rent the Property without interference."  *Id.*

"To form the basis for a taking claim, a purported distinct investment-backed expectation must be objectively reasonable."  *Colony Cove*, 888 F.3d at 452; *see also Bridge Aina Le'a*, 950 F.3d at 633.  The reasonableness of a plaintiff's expectations must be evaluated against "the regulatory environment at the time of the acquisition of the property."  *Bridge Aina Le'a*, 950 F.3d at 634.  "Unilateral expectations" cannot form the basis of a takings claim.  *Id*. at 633-34.

Plaintiffs have failed to demonstrate that the Emergency Rule interfered with any objectively reasonable investment-backed expectation.  First, Plaintiffs' expectation that they could utilize their property as a vacation rental with absolutely no limitations or restrictions is not reasonable.  By contrast, it is objectively reasonable that the government would act to protect the public in response to a major natural disaster.  *See, e.g.*, *Or. Restaurant & Lodging Ass'n v. Brown*, 2020 WL 6905319, at *6 (D. Or. Nov. 24, 2020) (holding that an emergency order barring in-person restaurant service did not interfere with restaurants' distinct investment-backed expectations because "[t]here is no reasonable investment-backed expectation that the state would not act in the face of a historic public health crisis.  The Governor's authorities to protect the public are long-standing . . .").

Second, while Plaintiffs' expectation of using the property as a "*long-term vacation rental investment*" may be reasonable, Plaintiffs have failed to show that the Emergency Rule interfered with that expectation.  The temporary rule remained in force for approximately one year.  Once road conditions were deemed sufficiently safe, the prohibition on vacation rentals was lifted and property owners were able to resume renting.  A short-term use restriction in order to deal with a natural disaster does not interfere with the viability of the property as a long-term vacation rental investment.  *See Tahoe-Sierra Preservation Council*, 535 U.S. at

342, 342 n.36 (concluding that a 32-month moratorium on development did not interfere with the plaintiffs' investment-backed expectation in the long-term use of their property; noting that "the temporary restriction [on any use of private land due to flooding] that was ultimately upheld in [*First English Evangelical Lutheran Church of Glendale v. Cnty. of Los Angeles*, 482 U.S. 304 (1987)] lasted for more than six years"; and suggesting that "[t]here *may* be moratoria that last *longer than one year* which interfere with reasonable investment-backed expectations") (emphasis added) (citing *First English Evangelical Lutheran Church of Glendale v. Cnty. of Los Angeles*, 210 Cal. App. 3d 1353, 258 Cal. Rptr. 893 (1989)).

### 3.  *Character of the State Action*

Even assuming the Emergency Rule had resulted in significant economic loss and disruption of Plaintiffs' investment-backed expectations, the character of the government action at issue outweighs any harm the Plaintiffs may have experienced under the other two factors.  *Penn Central* provides that state actions that "'adjust[] the benefits and burdens of economic life to promote the common good' . . . rarely constitute a taking."  *PCG-SP Venture I LLC v. Newsom*, 2020 WL 4344631, at *10 (C.D. Cal. June 23, 2020) (quoting *Penn Central*, 438 U.S. at 124); *see also Mugler v. Kansas*, 123 U.S. 623, 668 (1887) ("[P]rohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just

sense, be deemed a taking."); *cf. United States v. Caltex*, 344 U.S. 149, 154 (1952) (holding, in the physical takings context, that "in times of imminent peril—such as when fire threatened a whole community—the sovereign could, with immunity, destroy the property of a few that the property of many and the lives of many more could be saved."); *Miller v. Schoene*, 276 U.S. 272, 279-80 (1928) ("[W]here the public interest is involved preferment of that interest over the property interest of the individual, to the extent even of its destruction, is one of the distinguishing characteristics of every exercise of the police power which affects property.")

Thus, in *Keystone Bituminous Coal Ass'n*, a state law that prohibited the plaintiffs from mining on their property was held not to constitute a taking, in part, because the state had "acted to arrest what it perceives to be a significant threat to the common welfare . . . [by] minimiz[ing] subsidence in certain areas." 480 U.S. at 485.  Likewise, in *Hotel & Motel Ass'n of Oakland*, an ordinance requiring nonconforming use hotels to meet standards imposed on other hotels was not considered a taking because "[b]ased on legislative findings" "[t]he ordinance[], on [its] face, [is] directed toward protecting the health and welfare of citizens and visitors in Oakland."  343 F.3d at 967.

And, over the past year, courts across the country have been rejecting takings claims stemming from state and municipal prohibitions on business operations enacted to curb the spread of COVID-19.  These prohibitions have been

deemed "quintessential examples" of regulations that "adjust[] the benefits and burdens of economic life to promote the common good" by converting "public health burdens into economic burdens." *PCG-SP Venture I*, 2020 WL 4344631, at *10 ("To the extent the Orders temporarily deprive Plaintiff of the use and benefit of its Hotel, the Takings Clause is indifferent. The State is entitled to prioritize the health of the public over the property rights of the individual."). For example, in *Blackburn v. Dare County*, 2020 WL 5535530 (E.D.N.C. Sept. 15, 2020), as in this case, the plaintiff non-resident property owners alleged that a county emergency declaration that prohibited them and non-resident visitors from entering the county to access their vacation homes in order to slow the spread of COVID-19 constituted a taking. *Id.* at *1. The court rejected this argument, holding that the county's "legitimate exercise of its emergency management powers . . . to protect public health . . . weighed against loss of use indirectly occasioned by preventing plaintiffs from personally accessing their vacation home . . . does not plausibly amount to a regulatory taking." *Id.* at *8; *see also, e.g.*, *Oregon Restaurant and Lodging Ass'n*, 2020 WL 6905319 at *5; *Bimber's Delwood, Inc. v. James*, 2020 WL 6158612, at *15-17 (W.D.N.Y. Oct. 21, 2020); *Baptiste v. Kennealy*, 2020 WL 5751572, at *21-22 (D. Mass. Sept. 25, 2020).

Here, too, the County was entitled to prioritize the health and safety of residents and emergency workers over the Plaintiffs' desire to rent their property.

The rule was enacted in response to a devastating natural disaster in order to "protect the health, safety, and welfare of the people."  ECF No. 28-9 at PageID # 184.  And it was extended "until the roadwork repairs on Kuhio Highway . . . are completed and the highway is deemed safe for normal travel."  ECF No. 28-18 at PageID # 211.  These repairs were necessary to reconnect the isolated communities in the distressed area to the rest of the island.  Allowing vacationers to traverse the unstable road to reach their rentals would have both increased wear and tear— thereby slowing completion of the repairs—and endangered emergency workers and residents who had no choice but to use the road.  ECF No. 28-2 at PageID # 168.  Kauai's Emergency Rule, too, is a "quintessential example" of legitimate public action to which "the Takings Clause is indifferent."  *PCG-SP Venture I*, 2020 WL 4344631, at *10.

In short, there is no genuine issue of material fact suggesting that a taking occurred.  The Rule resulted in insignificant economic loss, did not interfere with *reasonable* investment-backed expectations, and advanced the most legitimate of government interests: protecting public health and welfare.  Defendants' Motion for Summary Judgment as to the state and federal takings claims is GRANTED and Plaintiffs' Motion for Summary Judgment as to the takings claim is DENIED.

///

///

**B.      Due Process**

The United States and Hawaii Constitutions protect individuals from deprivation of life, liberty, or property without due process of law.  U.S. Const. amend. XIV, § 1; Haw. Const. art. 1, § 5.  This protection includes both a procedural and substantive component.  The right to procedural due process protects individuals from deprivation of a constitutionally protected interest without adequate procedural protections.  *Endy v. Cnty. of Los Angeles*, 975 F.3d 757, 764 (9th Cir. 2020); *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998); *State v. Guidry*, 105 Haw. 222, 227, 96 P.3d 242, 247 (2004).  And the right to substantive due process protects individuals from arbitrary and irrational state interference with such interests.  *Lingle*, 544 U.S. at 54; *Halverson v. Skagit Cnty.*, 42 F.3d 1257, 1261 (9th Cir. 1994); *State v. Mallan*, 86 Haw. 440, 446, 950 P.2d 178, 184 (1998).  Here, Plaintiff argues that the Emergency Rule and resultant deprivation of their TVR use[7] violates both their procedural and substantive due process rights.  Both arguments fail.[8]

---

[7]  Once again, the court assumes without deciding that Plaintiffs' nonconforming use of their property as a TVR constitutes a protected property interest.

[8]  The analysis of due process claims under the Hawaii Constitution is substantially similar to the analysis of due process claims under the United States Constitution.  *See Sandy Beach Defense Fund v. City Council of City & Cnty. of Honolulu*, 70 Haw. 361, 378-79, 773 P.2d 250, 261-62 (Haw. 1989) (procedural due process); *Mallan*, 86 Haw. at 446, 950 P.2d at 184 (substantive due process).  And neither party attempts to differentiate their arguments under the United States and Hawaii Constitutions.  Accordingly, the court analyzes the state and federal due process claims together.

### 1.    *Procedural Due Process*

Plaintiffs argue that the Emergency Rule violated their procedural due process rights because it deprived them of their property without notice or an opportunity to be heard.  ECF No. 29-1 at PageID # 310.  And it is true that, ordinarily, due process requires "notice and an opportunity for some kind of hearing prior to the deprivation of a significant property interest."  *Halverson*, 42 F.3d at 1260 (internal quotation and citation omitted).  But when a government action is legislative in nature—that is, "when governmental decisions . . . affect large areas and are not directed at one or a few individuals"—"general notice as provided by law is sufficient."  *Id.* at 1261.  The greater procedural rights of individual notice and hearing "may attach where only a few persons are targeted or affected and the state's action exceptionally affects them on an individual basis."  *Hotel & Motel Ass'n of Oakland*, 344 F.3d at 969 (internal quotation and citation omitted).

In *Hotel & Motel Ass'n*, the Ninth Circuit determined that a city ordinance applicable to all nonconforming use hotels in the city did not violate procedural due process because it affected "a broad geographic area and the complete range of [legal nonconforming hotels], as opposed to one or a few individuals or establishments."  *Id.*  In that case, the ordinance at issue was specifically targeted at a smaller number of hotels that had problems with drugs

and prostitution.  But "the mere fact that a subcategory of hotels motivated the City

Council to act does not change the legislative quality of the ordinance." *Id.*  Put

another way, the requirements of notice and the opportunity to be heard were not

implicated because the county's ordinance did not "specifically target[] a single

individual's property for a zoning change"; rather, the ordinance "affect[ed] an

entire class of Oakland hotels." *Id.*; *see also Samson v. City of Bainbridge Island*,

683 F.3d 1051, 1056-1060, 1060 n.10 (9th Cir. 2012) (holding that an emergency

ordinance imposing a moratorium on shoreline development that was enacted

without a public hearing did not run afoul of procedural due process because it

"applied generally to all owners of shoreline property on Bainbridge Island").

Here, too, Plaintiffs have failed to put forth any evidence that the

Emergency Rule "specifically target[ed]" or "exceptionally affect[ed]" them on an

individual basis.  The Rule broadly prohibited all visitors from entering the

distressed area and prohibited all TVRs from operating.  And although the Rule

could be fairly described as specifically targeting TVR owners, it would still not

offend due process.  Like the nonconforming use hotels in *Hotel & Motel Ass'n*

and the shoreline property owners in *Samson*, the rule affected the "entire class" of

TVR owners in the disaster area—approximately 80 properties.  *See generally* ECF

No. 42-8; *cf. Hotel & Motel Ass'n*, 344 F.3d at 970 ("None of the allegations made

by the Association, or by the forty-nine individual plaintiffs who brought this

action, support the claim that one or only a few individuals were targeted or affected.").[9]  The County's Motion for Summary Judgment as to the state and federal procedural due process claims is GRANTED and Plaintiffs' Motion as to the same is DENIED.

### 2.  *Substantive Due Process*

Plaintiffs advancing a substantive due process claim must meet an "exceedingly high burden."  *Shanks v. Dressel*, 540 F.3d 1082, 1088 (9th Cir. 2008) (quoting *Matsuda v. City & Cnty. of Honolulu*, 512 F.3d 1148, 1156 (9th Cir. 2008)).  A state action violates substantive due process only if it was "clearly arbitrary and unreasonable, having no *substantial relation to the public health, safety, morals, or general welfare*."  *Lingle*, 544 U.S. at 541 (emphasis in original) (quoting *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395 (1926)); *Mallan*, 86 Haw. at 452, 950 P.2d at 190 (setting out the same standard); *see also Shanks*, 540 F.3d at 1088 ("[T]he irreducible minimum of a substantive due process claim . . . is failure to advance any legitimate governmental purpose.") (internal quotation omitted).  There is no substantive due process violation if it is "at least fairly debatable" that the government's conduct is rationally related to a

---

[9]  Further undermining Plaintiffs' position—at least with respect to the initial enactment of the Emergency Rule—is the well-settled rule that "summary administrative action may be justified in emergency situations," including actions that effect a "deprivation of property to protect the public health and safety."  *Carmichael v. Ige*, 470 F. Supp. 3d 1133, 1148 (D. Haw. 2020) (quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 300 (1981)).

legitimate interest.  *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1238 (9th Cir. 1994) (internal quotation and citation omitted); *see also Halverson*, 42 F.3d at 1262 (explaining that plaintiffs in substantive due process claims "shoulder [the] heavy burden" of demonstrating "the irrational nature of the County's actions by showing that the County could have had no legitimate reason for its decision") (internal quotation and citation omitted).

Where, as here, an executive action is at issue, "only 'egregious official conduct can be said to be arbitrary in the constitutional sense': it must amount to an 'abuse of power' lacking any 'reasonable justification in the service of a legitimate governmental objective.'"  *Shanks*, 540 F.3d at 1088 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (internal quotations omitted)). And where, as here, the contested government action does not interfere with fundamental rights, courts "do not require that the government's action actually advance its stated purposes, but merely look to see whether the government *could* have had a legitimate reason for acting as it did."  *Wedges/Ledges of California, Inc. v. City of Phoenix*, 24 F.3d 56, 66 (9th Cir. 1994) (emphasis in original) (evaluating deprivation of property claim).

Plaintiffs have wholly failed to advance a substantive due process claim.  They assert that the Emergency Rule was applied arbitrarily because it allowed emergency workers, construction workers, and residents into the disaster

area, but did not allow vacationers the same access.  ECF No. 29-1 at PageID #

312 ("the County arbitrarily limited one set of users who would otherwise have a

lawful destination in the area—vacation rental guests.").[10]

        But it is Plaintiffs' argument—not the County's Emergency Rule—

that is irrational.  As discussed above, the Emergency Rule was enacted to "protect

the health, safety, and welfare of the people" by limiting the number of individuals

in an unsafe and isolated area ravaged by flooding and landslides.  ECF No. 28-9 at

PageID # 184.  The decision to allow emergency responders, construction workers,

and residents into the area while prohibiting vacationers from doing the same was

rationally related to that legitimate interest.  Emergency responders and

construction workers were engaged in essential services to repair the damage

caused by the floods.  And the County determined that it was not logistically or

economically feasible to evacuate residents.  ECF No. 28-2 at PageID # 167.  By

contrast, allowing vacationers into the disaster area would only have "increased the

number of people who needed emergency assistance" and "could have further

---

[10]  Plaintiffs also argue that "while long-term tenants of properties that were not TVR
properties were allowed to access those properties . . . TVR owners were not able to rent long-
term." ECF No. 29-1 at PageID ## 312-13.  But this argument is spurious.  The County has
explained that it allowed Plaintiffs and other TVR owners to rent their properties to residents of
the area—many of whom had been displaced from their homes and were in need of housing—
while the rule was in effect, ECF No. 28-2 at PageID # 168, and the Emergency Rule does not,
on its face, prohibit TVR operators from renting their properties long-term.  ECF No. 37-4 at
PageID # 417.

damaged the road and endangered both uses of the road and workers."  ECF No.

27-1 at PageID # 146.

In short, there is simply no evidence suggesting that the County's

temporary prohibition on vacationers entering the distressed area was irrational or

arbitrary.  Defendants Motion for Summary Judgment as to the state and federal

substantive due process claim is GRANTED and Plaintiff's Motion is DENIED.

## C.    Equal Protection

Both the United States and Hawaii Constitutions guarantee every

person "equal protection of the laws."  U.S. Const., amend. XIV, § 1; Haw. Const.

art. 1, § 5; *see also Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)

(explaining that the Equal Protection Clause protects "every person within the

State's jurisdiction against intentional and arbitrary discrimination").  Plaintiffs

allege that the County discriminated against TVR operators by treating them

differently from other property owners in the distressed area.  Such a classification,

"'neither involving fundamental rights nor proceeding along suspect lines . . .

cannot run afoul of the Equal Protection Clause if there is a rational relationship

between disparity of treatment and some legitimate governmental purpose.'"

*Armour v. City of Indianapolis*, 566 U.S. 673, 680 (2012) (quoting *Heller v. Doe*,

509 U.S. 312, 319-320 (1993)); *Nagle v. Board of Ed.*, 63 Haw. 389, 395, 629 P.2d

109, 113 (1981).

Under this standard, a state law will survive an equal protection challenge if there is "any reasonably conceivable state of facts that could provide a rational basis for the classification." *Armour*, 566 U.S. at 681 (internal quotation omitted). The inquiry is not whether the challenged action "*actually* furthered a legitimate interest; it is enough the governing body *could have rationally decided* that the action would further that interest." *Crawford v. Antonio B. Won Pat Int'l Airport Auth.*, 917 F.3d 1081, 1095 (9th Cir. 2019) (internal quotation omitted). Put another way, to prevail on an equal protection claim, the plaintiff must "negative every conceivable basis which might support the [government action] that he challenges." *Id.* (quoting *Armour*, 566 U.S. at 681).

As discussed when evaluating Plaintiffs' substantive due process claim, the Emergency Rule's differential treatment of vacationers on the one hand and residents and emergency responders on the other was rationally related to the government's interest in protecting public health and safety and facilitating the safe and timely repair of the damaged road. The County's Motion for Summary Judgment as to the state and federal equal protection claims is GRANTED.

**D.    Contract Clause**

Next, Plaintiffs argue that the County's Emergency Rule violated the Contract Clause of the United States Constitution by "disrupt[ing] the rental contracts that Plaintiffs had entered into with guests" who had planned to stay at

Plaintiffs' property during the time the Rule was in effect.  ECF No. 29-1 at PageID # 313.

The Contract Clause states that "[n]o State shall  . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. Const., art. I, § 10, cl. 1.  "Despite the sweeping terms of its literal test, the Supreme Court has construed this prohibition narrowly in order to ensure that local governments retain the flexibility to exercise their police powers effectively."  *Matsuda*, 512 F.3d at 1152; *see also Exxon Corp. v. Eagerton*, 462 U.S. 176, 190 (1983) ("The Contract Clause does not deprive the States of their broad power to adopt general regulatory measures without being concerned that private contracts will be impaired, or even destroyed, as a result.") (internal quotation omitted); *Ching Young v. City & Cnty. of Honolulu*, 639 F.3d 907, 913 (9th Cir. 2011) ("But, despite its seemingly absolute language, the clause does not prohibit a State from acting 'for the general good of the public,' even where contractual obligations may be affected.") (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 242 (1978)).

Courts apply a two-step analysis to address Contract Clause claims. *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018).  First, courts consider whether the state action constitutes a substantial impairment of contract.  *Id.* at 1821-22. Second, if the action does work such an impairment, it is still constitutional if "the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a

significant and legitimate public purpose.'" *Id.* at 1822 (quoting *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411-412 (1983)). Unless the state is a party to the contract, courts "'defer to [the government's] judgment as to the necessity and reasonableness of a particular measure.'" *Campanelli v. Allstate Life Ins. Co.*, 322 F.3d 1086, 1098 (9th Cir. 2003) (quoting *Energy Reserves Grp.*, 459 U.S. at 412-413).

Here, assuming without deciding that the Emergency Rule worked a substantial impairment on Plaintiffs' contracts, the Contract Clause claim fails because—as by this point oft repeated—the Rule was enacted for a legitimate public purpose: protecting public health and safety in the wake of a devastating natural disaster. *See Campanelli*, 322 F.3d at 1099 (finding that although a state law substantially impaired contracts, it did not violate the Contracts Clause because "it was passed for a legitimate public purpose": "to bring needed relief to the victims of the Northridge Earthquake."); *see also Spannaus*, 438 U.S. at 242 (explaining that a legitimate governmental purpose exists where a rule is enacted "to protect a basic societal interest, not a favored group"). This purpose was reflected on the face of the Rule itself, which declared that its aim was to "provide relief for disaster damages, losses, and suffering, and to protect the health, safety, and welfare of the people." ECF No. 28-9 at PageID # 184; *see Spannaus*, 438 U.S. at 242 (explaining that it is significant for the purpose of a Contract Clause

claim that the government had "declared in the Act itself that an emergency need

. . . existed").

Further, the Rule was "appropriately tailored to the emergency that it

was designed to meet." *Spannaus*, 438 U.S. at 242.  The Rule served its stated

purpose of reducing the number of at-risk individuals in the distressed area and

reducing traffic on the road while it was under repair.  And the conditions imposed

by the Rule were reasonable.  The Rule remained in force for just one year—the

amount of time it took for road repairs to reach a stage where it became safe for

normal traffic to resume, and TVR operators were granted relief from taxing and

permitting requirements during that period.  *See, e.g.*, *Campanelli*, 322 F.3d at

1099 (holding that statute reviving insurance claims for all victims of an

earthquake was appropriately tailored to provide relief for earthquake victims

because the earthquake was a one-time event with a discrete, albeit large, number

of victims and because the claims were revived for only one year).  The County's

Motion for Summary Judgment as to the Contract Clause claims is GRANTED.

## E.    HRS § 127A-21

Plaintiffs argue that the Emergency Rule violated HRS § 127A-21 by

requisitioning their property without just compensation.  HRS § 127A-21 provides

that "[t]he governor or mayor may requisition and take over any materials,

facilities, or real property or improvements, required for the purposes of this

chapter, or requisition and take over the temporary use thereof" so long as the

property owner is provided adequate notice and compensation.  This provision has

no applicability here.  The mayor did not invoke § 127A-21 in his emergency

proclamation.  And, more to the point, Plaintiffs have provided no evidence that

the County took over, requisitioned, or temporarily used their property.  There are

no genuine issues of material fact to support Plaintiffs' HRS § 127A-21 claim.

The County's Motion for Summary Judgment as to the HRS § 127A-21 claim is

GRANTED.

## F.    Vested Rights/Zoning Estoppel

Finally, Plaintiffs argue under the "related" state law doctrines of

"vested rights" and "zoning estoppel" that the County was precluded from

abrogating Plaintiffs' right to use their property as a TVR.  ECF No. 29-1 at

PageID # 299-301; *see also Allen v. City & Cnty. Of Honolulu*, 58 Haw. 432, 435,

571 P.2d 328, 329 (Haw. 1977) (explaining that while "theoretically distinct,

courts across the country seem to reach the same results when applying [the zoning

estoppel and vested rights doctrines] to identical factual situations"); *Kauai Cnty v.

Pacific Standard Life Ins. Co.*, 65 Haw. 318, 326, 653 P.2d 766, 773 (Haw. 1982)

(explaining that "[e]stoppel focuses on whether it would be inequitable to allow the

government to repudiate its prior conduct; vested rights upon whether the owner

acquired real property rights which cannot be taken away by government

regulation.") (citation and internal quotations omitted).  Both doctrines are implicated when the plaintiff has suffered a change in position based on a "substantial expenditure of money in connection with his project in reliance, not solely on existing zoning laws or on good faith expectancy that his development will be permitted, but on official assurance on which he has a right to rely that his project has met zoning requirements, that necessary approvals will be forthcoming in due course, and he may safely proceed with the project." *Kauai Cnty*., 65 Haw. at 327, 653 P.2d at 774.

It is not clear that these doctrines—which are typically applied to cases concerning the effect of amendments to zoning regulations on development projects—are relevant here, in a case about a temporary emergency rule.  But the court need not reach that question.  The Hawaii Supreme Court made clear in *Allen* that "damages [are] unavailable under both theories." *Bridge Aina Leʻa, LLC v. State of Haw. Land Use Comm'n*, 125 F. Supp. 3d 1051, 1080 (D. Haw. 2015) (citing *Allen*, 58 Haw. at 437-38, 571 P.2d at 328-30 ("The remedy is to allow continued construction, not award damages.")).  Because the Emergency Rule was lifted in April 2019, there is no basis for equitable relief in this case.  Accordingly, the County's Motion for Summary Judgment as to the vested rights/zoning estoppel claim is GRANTED and Plaintiff's Motion as to this claim is DENIED.

# V.  **CONCLUSION**

For the foregoing reason, the County's Motion for Summary

Judgment is GRANTED and Plaintiffs' Motion for Partial Summary Judgment is

DENIED.  The clerk of court is directed to close the case file.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, February 18, 2021.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Flint v. County of Kauai*, Civ. No. 19-00521, Order Granting Defendants' Motion for Summary Judgment and Denying Plaintiffs' Motion for Partial Summary Judgment.